# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIS FRANK BAILEY JR., | Case No. 1:22-cv-01273-JLT-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| RAYMOND MADDEN, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On October 26, 2018, Petitioner was convicted after a jury trial in the Kern County Superior Court of attempted murder (count 1), criminal threats (counts 2 and 3), assault with a firearm (counts 4 and 5), and dissuading a witness by force or threat (counts 6 and 7). (4 CT[1] 900–27.) Petitioner was sentenced to a total term of 302 years to life in prison. People v. Bailey, No. F079127, 2022 WL 352028, at *3 (Cal. Ct. App. Feb. 7, 2022). On February 7, 2022, the California Court of Appeal, Fifth Appellate District affirmed the judgment with a modification to award Petitioner additional local conduct credit. Id. at *27. On April 13, 2022, the California Supreme Court denied Petitioner's petition for review. (LDs[2] 27, 28.)

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 12.)
[2] "LD" refers to the documents lodged by Respondent. (ECF No. 12.)

On October 6, 2022, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1.) Therein, Petitioner raises the following claims for relief: (1) insufficient evidence to convict Petitioner of dissuading a witness; (2) cruel and unusual punishment; and (3) introduction of inadmissible hearsay statements. Respondent filed an answer. (ECF No. 13.)

## II.

## STATEMENT OF FACTS[3]

### *I. The People's case.*

#### A. Doneisha

Doneisha first met defendant in approximately September 2015, when defendant and Doneisha's mother, Volonda, visited Doneisha while she was incarcerated for a crime involving moral turpitude. Doneisha next saw defendant when defendant and Volonda picked her up from prison after her release on June 8, 2016. Defendant had been living with Volonda for some time. Doneisha had problems with defendant because he failed to return Volonda's car on time when Volonda permitted him to use it.

Doneisha stayed with Volonda the night she was released from prison and with a friend for serval [sic] nights thereafter. Doneisha returned to Volonda's house and stayed in the guest bedroom located across from the primary bedroom shared by defendant and Volonda. On cross-examination, Doneisha admitted that she previously testified to staying with Volonda between June 23 and June 25, 2016, but later testified that she arrived the night of June 20, 2016.

According to Doneisha, when she moved in with Volonda in late June 2016, defendant was not staying at Volonda's house. Doneisha's boyfriend of two years, Denzel, occasionally stayed with Doneisha in Volonda's house toward the end of June 2016. Her contact with Denzel violated the terms of her parole, and she did not report it to her parole officer.

On June 23, 2016, Doneisha drove Volonda to San Joaquin Hospital (the hospital) where it was determined that Volonda had suffered two strokes. Approximately two hours after arriving at the hospital, defendant arrived to visit Volonda. Doneisha saw defendant in the parking lot before he went to Volonda's hospital room and argued with him because she did not feel that defendant was being attentive enough to Volonda. In addition, Doneisha needed to borrow Volonda's vehicle at a certain time and defendant was ignoring her calls. Doneisha called defendant an inconsiderate "asshole." Once defendant arrived at Volonda's hospital room, defendant and Volonda argued because Volonda wanted to lend her car to Doneisha. Defendant grabbed Volonda's keys from her purse and refused to give them to Doneisha.[4] According to Doneisha, the nurse escorted defendant from the room and defendant took the keys with him. Volonda asked

---

[3] The Court relies on the California Court of Appeal's February 7, 2022 opinion for this summary of the facts of the offense and procedural history. <u>See</u> Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] Doneisha had not previously described that Volonda and defendant struggled over Volonda's purse or that defendant forcefully took the purse from Volonda and removed the keys.

Denzel, who was also present, to retrieve them, and Doneisha followed Denzel downstairs to the parking lot.

Upon reaching the parking lot, Doneisha heard Denzel ask defendant for Volonda's keys. Defendant refused and moved as if to hit Denzel. Denzel responded that he only wanted the keys and did not want to fight. Defendant again moved as if he intended to hit Denzel, and Denzel punched defendant. Defendant fell back against a car and dropped the keys. Denzel picked up the keys as defendant told him, " 'I'm gonna kill you ....' "[5] Doneisha and Denzel returned to Volonda's hospital room and told her what had occurred. A few minutes later, Doneisha and Denzel walked out to Volonda's car and saw defendant standing near it. Denzel tried to shake defendant's hand, but defendant refused and said, " 'I'm gonna kill you.' " At the time, Doneisha noticed the smell of alcohol, observed broken glass by the car, and smelled beer near the gas tank. Doneisha and Denzel later drove Volonda's vehicle to Volonda's house and spent the night.

The following day, June 24, 2016, Doneisha missed a phone call from defendant. When she returned the call, defendant denied that he had called. Later in the day, Doneisha answered her cell phone and heard defendant talking to another man. Defendant did not appear to realize that he had called Doneisha. She heard defendant say that he needed a gun and the other individual respond, " 'Man, you don't need no gun. You need to calm down.' " Later that night, Doneisha listened to a lengthy voicemail left by defendant. The voicemail was played for the jury and defendant again appeared to be talking to someone else and unaware that he had called Doneisha. Defendant appeared to be discussing his relationship with Doneisha and Volonda, although many words were not intelligible. Defendant referred to Doneisha as "your daughter" and "bitch" and seemed upset that Doneisha was "get[ing] in[to] [his] business."

Earlier that day, Doneisha had used Volonda's vehicle to drive to the hospital and visit Volonda. She and Denzel returned to Volonda's house before midnight. Doneisha noticed defendant's clothing in the guest bedroom, but the clothes had not been there previously. Doneisha and Denzel checked the house and determined that no one else was present. However, she noticed that the bed in the primary bedroom was pulled two and a half feet away from the wall under the window, and the screws that lock that window were loose. Although she did not push the bed back against the wall, photographs taken after the incident show the bed flush against the wall.

Doneisha and Denzel started a load of laundry after checking the house. Doneisha texted her sister that she was doing laundry. After switching laundry loads, she fell asleep with Denzel next to her watching television. Doneisha identified photographs of her cell phone, testified to her cell phone number, and identified her cell phone as that used to text her sister that she was doing laundry.

After midnight, on the morning of June 25, 2016, Doneisha awoke hearing a loud boom and defendant's voice. She could not recall exactly what he said until reviewing her prior testimony. Defendant said, " 'I know you motherfuckers are in here.' " Doneisha testified that she previously told police that defendant crashed in the front door because she heard a loud noise and it did not sound as if defendant had used a key. Denzel opened the door to the hallway and stepped out. Doneisha followed and put her head into the hallway while standing in the

---

[5] During cross-examination, Doneisha elaborated that defendant said, " 'I'm gonna kill you, ... and I put that on my momma, and she'll suck your dick, and she in the dirt.' "

doorway. She saw defendant down the hallway and watched as he held up a small revolver, pointed it toward Denzel's head, and fired it. Doneisha heard the shot and saw a hole in the cabinet at the end of the hallway behind Denzel, right above his head.[6] Denzel pushed her back into the guest bedroom, closed the door, and used his body to brace the door while unsuccessfully grabbing for a knife from the block of kitchen knives he had put in the room earlier for protection.[7]

Defendant banged on the door as Denzel told Doneisha to call the police. Doneisha called 911, provided the operator her name and address, and advised the operator that someone was in the house with a gun. Defendant yelled at Doneisha to hang up the phone or he would shoot her and Denzel. After reviewing prior testimony, Doneisha recalled that defendant specifically said, " 'Bitch, hang up the phone. You call the police, I'm gonna kill you and I'm gonna kill him too.' " Doneisha ended the call, scared that defendant would shoot them.

Doneisha testified that Denzel then opened the door and charged defendant, wrapping his arms around defendant and pushing him back into the primary bedroom across the hallway from the guest bedroom. Both men crashed into the bed wrestling for the gun. Doneisha could not see the men after they entered the primary bedroom, but she heard a shot, heard Denzel groan, and then heard another shot. Pulling on clothes, Doneisha went into the primary bedroom and saw Denzel sitting on the floor, bleeding from his legs.

When Doneisha entered the primary bedroom, defendant was at the end of the hallway. Doneisha picked up Denzel and helped him walk into the hallway. Defendant, still holding the gun, said, " 'You all thought I was playing, huh?' " and then, " 'Now you and your nigga better get the fuck out.' " Doneisha asked defendant for permission to retrieve personal items and helped Denzel walk out of the house. Doneisha and Denzel headed for Volonda's car. Defendant demanded that Doneisha give him the car key as he was putting the gun into his pocket. Doneisha threw Volonda's key (acquired by Denzel from defendant on June 23, 2016) at defendant. When shown a photograph of a set of keys on a table in Volonda's hallway, Doneisha did not recognize the set of keys but was able to identify the key to Volonda's vehicle that she had turned over to defendant. Doneisha testified that Volonda only possessed a single key for the vehicle.

Doneisha testified that defendant had put the gun into his pocket as Denzel and Doneisha walked down the driveway, but reached for it as he said, " 'Now apologize. Say I'm sorry, .... Say I'm sorry.' " After reviewing prior testimony, Doneisha then testified that defendant was holding the gun when he told Denzel to apologize. Denzel apologized to defendant. Defendant told Doneisha that he intended to tell the police that there was a burglar in his house and that he shot the burglar because he did not know who it was.

Doneisha and Denzel walked down the street and she tried to call the police again. She provided her name and advised the operator that she had just called with her address and was now walking down her block. Defendant approached on a bicycle and she ended the call. He said something like, " 'I knew you would call the police.' " She denied using her cell phone. After defendant left, Doneisha and Denzel walked to a neighbor's residence around the corner from Volonda's house,

---

[6] On cross-examination, defense counsel impeached Doneisha with her to statement to police that she did not see the gun initially and that Denzel told her that defendant had a gun.

[7] Doneisha testified on redirect examination that Denzel brought the knives into the guest bedroom because Volonda called her the night before the incident and warned her to be careful because defendant "was talking stupid."

and the neighbor assisted by allowing them into the house while Doneisha called 911 again.

Doneisha's last call to 911 was admitted into evidence and played for the jury. Doneisha advised the operator that she was at the neighbor's residence. When asked if she called previously, Doneisha responded, "I've been calling but I keep happen [*sic*] to hang up because this guy's chasing us down the street and he told me if I called the police ...." Doneisha testified that defendant said he would shoot her and Denzel if they called the police. During the 911 call, after identifying and describing defendant, Doneisha said, "I tried to walk and get help because he keeps following us. [¶] ... [¶] ... Well he's been riding around on his bike saying that he was going to shoot if I called the police ...."

Doneisha was interviewed by an officer while at the neighbor's residence. A second officer later interviewed Doneisha at the police station. Before going to the station, Doneisha called Volonda and told her about the shooting. Later that morning, two detectives drove Doneisha to the hospital and interviewed Volonda.

Doneisha authenticated a video of Volonda's house, recorded June 25, 2016. She identified a bicycle located in the living room as that used by defendant that morning. Doneisha explained the events with reference to the video, indicating where she was located as the incident progressed. She identified the bullet hole in the hallway cabinet and the blood located in the primary bedroom where she found Denzel after he had been shot.

### B. Doneisha's Interview with Officer Moore[8]

Officer Christopher Moore responded to the neighbor's residence and met with Doneisha. She had been crying and was upset and while Denzel was loaded into the ambulance. Officer Moore interviewed Doneisha and recorded the interview. Upon defense counsel's motion, the trial court admitted the interview into evidence, and the audio was played for the jury. Doneisha first told the officers, "They didn't even fight. We were laying down. And he busted the door and he shot the gun once so Densel [*sic*] tried to wrestle him and get the gun from him because he knew he had a gun. And then he let off the other three shots." Doneisha told Officer Moore that she was not familiar with firearms but described the gun as small and fitting into defendant's pocket.[9]

Doneisha told Officer Moore that she called 911 from inside the house after hearing the shot but had to end the call because she feared defendant would shoot again. Doneisha called the police again while walking down the street. Defendant rode a bicycle up to Doneisha and Denzel and said, " '[Y]eah we gonna see—we gonna see who gonna be the real snitch—let's see if these police show up—you wanna fucken call the police.' " Doneisha assured defendant that she did not call the police and begged him not to shoot again. Doneisha and Denzel went to a neighbor's house, and Doneisha called the police once more.

Doneisha told Officer Moore that on June 24, 2016, Volonda told defendant not to go to her house and instructed Doneisha to change the locks the following morning. Doneisha explained she and Denzel were the only people in Volonda's house, they were doing laundry, and she had fallen asleep. Doneisha told Officer

---

[8] Because Doneisha's statements were admitted as prior statements, we may consider them for their truth and will set forth their contents individually. (See Evid. Code, §§ 1235, 1236; CALCRIM No. 318.)

[9] While interviewing Doneisha, Officer Moore mentioned that Denzel described the firearm as a revolver.

Moore she had been staying at Volonda's house for two or three days, caring for Volonda, who had been sick, and using Volonda's car since being paroled.

After a break in the interview, Doneisha told Officer Moore that she awoke on June 25, 2016, after 12:25 a.m. when she heard defendant bang on the door and yell, " 'I know you mother fuckers are in there.' " He also yelled, " 'What you thought I was fuckin' playin' wit' you?' " Doneisha said that Denzel stepped into the hallway while she tried to dress. As Doneisha picked up her cell phone to call the police, she heard defendant say, " 'If you call the fuckin' police I'm gonna kill his ass. I'm gonna kill his ass.' " When Denzel stepped into the hallway, he asked, " 'Uh, like what's up man,' " and defendant replied, " 'Ain't no fuckin' what's up,' " and she heard the first gun shot. Denzel was not hit by the first shot. Later in the interview, Doneisha said she was behind Denzel when he stepped into the hallway. Denzel pushed defendant across the hallway into the primary bedroom, and they wrestled for the gun. Doneisha heard two more shots. Denzel fell to the floor, groaning. Defendant walked down the hallway ordering them to " 'get the fuck out.' " Doneisha told Officer Moore that defendant threatened her again while she was on the phone with the police and she ended the call, grabbed her backpack and slipped into her pants.

Defendant repeatedly ordered Doneisha and Denzel to leave the house, and Doneisha struggled to help Denzel walk outside. Defendant was standing in the front yard with the gun. Doneisha begged defendant not to shoot again, and defendant put the gun into his pocket. At some point, defendant ordered Denzel to apologize and let Denzel and Doneisha leave after Denzel said he was sorry.

Defendant initially followed them a short way on foot, but then left and returned on a bicycle. Doneisha explained, "And I had already called [911] again. [¶] ... [¶] ... And so when he pulled up he was like,—when I seen him on the bike I hurried up and hung up the phone again. [¶] ... [¶] ... And so he pulled up and he said, 'We're gonna see if you gonna be a snitch.' " Defendant also said, " 'We gonna see if you called the fuckin' police,' " and " 'I bet you fucking called the police, bitch.' " Doneisha denied calling the police and begged him to leave. She feared that defendant would shoot them. After defendant rode away on the bicycle, Doneisha directed Denzel to a street where defendant could not see them and called the police again as she and Denzel asked for help at a neighbor's house.

When asked more specifically about the bicycle, Doneisha explained that defendant usually rides a white bike stored in the guest bedroom, but the bicycle was not there when she and Denzel returned to Volonda's house on June 24, 2016. Upon returning, they thought defendant had been in the house because his clothes were on their bed in the guest bedroom, windows were left open, and all the lights were on. Doneisha noticed that the primary bedroom window was unlocked. Doneisha said that Volonda previously told defendant that she would deliver his belongings, but defendant replied that he would get his own things. Doneisha thought defendant entered the house through the primary bedroom window to retrieve his belongings as she had the house key.

Officer Moore asked Doneisha if she knew defendant had a gun before that evening. Doneisha said that earlier in the day on June 24, 2016, defendant had accidentally called her cell phone and she heard him talking to someone. She heard defendant say, " 'I need that gun you don't understand mine is my life.' " She heard the other individual tell defendant, " 'I'm not giving you know [*sic*] damn gun.' " She heard defendant reply, " 'I don't give a fuck it's my house and I need that gun.' " Doneisha ended the call and told Volonda about it. Doneisha then

received a long voicemail from defendant who, again, was conversing with someone else after accidentally calling Doneisha. Doneisha showed her cell phone to Officer Moore, and Officer Moore noted when defendant called and defendant's cell phone number. Doneisha said that during the recording, defendant told another individual that he was not going to let Doneisha and Denzel intrude on Volonda's house as he paid the bills. Defendant's references to "her daughter" during the recording caused Doneisha to believe defendant was referring to her during the conversation.

During her interview, Doneisha played defendant's voicemail, received June 24, 2016, at 9:06 p.m., and it was recorded as part of her interview with Officer Moore. Much of the recording was unintelligible, but defendant mentioned Volonda, her "daughter," paying bills, and "our house." Doneisha identified defendant's voice on the voicemail and explained that she first met defendant when he visited her while in prison and then again when she paroled.

### C. Doneisha's Interview with Detectives Vaughn and Feola

Detectives Ryan Vaughn and Christopher Feola interviewed Doneisha on June 25, 2016, at 5:35 a.m. Doneisha told the detectives that her mother, Volonda, lived alone since she had asked defendant to leave the house a few days before. When asked about Volonda's vehicle, Doneisha responded that defendant demanded Volonda's keys to the vehicle earlier that morning, and Doneisha threw them at him so defendant would not shoot her.

Doneisha explained to the detectives the events of the prior few days. Volonda went to the hospital on June 23, 2016. Defendant left the hospital several times, and Doneisha told him to stay with Volonda. They went to Volonda's hospital room. Doneisha was upset because she needed Volonda's car for a parole class, and defendant had not returned the car on time. Defendant told Volonda that he did not care that he was late and refused to let Doneisha "invade his house." Volonda asked defendant why he returned the car late and told defendant, " 'Just get your shit out of my house.' " Defendant said he did not want to leave the hospital, and Volonda asked for her keys back. After loud arguing, the nurse asked defendant to leave, and defendant left with the keys. Volonda asked Denzel to retrieve her keys. Doneisha followed and joined defendant and Denzel in the parking lot.

Defendant objected to Doneisha treating him with attitude and told Doneisha he sent the packages that she received in prison, not Volonda. Doneisha told defendant that she believed he should have been staying with Volonda in the hospital. Denzel asked for Volonda's keys, but defendant refused to give him the keys. Defendant "squared off with Denzel, and he just like kept punching at him." Doneisha turned away for a minute and then saw defendant throw a missed punch, and Denzel punched defendant back. Defendant fell back against a car, dropping the keys. Denzel picked them up. Doneisha and Denzel returned to Volonda's hospital room.

A few hours later, Doneisha and Denzel went back to the parking lot and saw defendant sitting on the car. After exchanging more words with defendant, Doneisha and Denzel returned to Volonda's hospital room. At some point during their earlier confrontation, defendant told Denzel that he had " 'fucked with the wrong one' " and said, " 'I'm gonna kill you.' "

The next day, on June 24, 2016, Doneisha received several cell phone calls wherein she could hear defendant talking to someone in the background, although defendant did not talk to her. She put one of the calls on speaker so Denzel could hear. Defendant told the other man that he needed to find a gun for defendant. The other individual tried to convince defendant that he did not need a gun, but defendant insisted that he needed it and it was his life. Doneisha told Volonda who tried to call defendant. Later, Doneisha noticed a voicemail from defendant, which was a recording of defendant talking to someone else. Volonda then called defendant, told him not to disrespect Doneisha, and instructed him to stay away from Volonda's house. Defendant told her he would retrieve his own belongings and said something that caused Volonda to ask defendant if he had made a threat.

Doneisha and Denzel left the hospital at approximately 11:00 p.m. Upon arriving at Volonda's house, they noticed the lights were on and defendant's dirty clothes were on their bed. They checked the entire house and found the primary bedroom window was unsecured and the bed pushed away from the wall under the window.

After starting laundry, Doneisha fell asleep at approximately 12:25 a.m. on June 25, 2016. She awoke when she heard defendant banging on the door. Defendant yelled, " 'I know you mother fuckers are in here.' " Doneisha said she and Denzel "heard the front door crash in," and they "saw [defendant] in the hallway," and she guessed Denzel "saw the gun before [she] did." She explained that she stood in the doorway of the guest bedroom and saw defendant reach into his pocket. Denzel closed the door to the guest bedroom, leaned against the door, and yelled for Doneisha to call the police because defendant had a gun. Defendant pushed on the door and said, " 'If you call the police, bitch, I'm gonna kill you, and I'm gonna shoot him, too.' " Doneisha ended the call as defendant pushed open the guest bedroom door. Denzel reached for a knife but did not get one. Defendant fired a shot, and Denzel charged him, pushing him into the primary bedroom across the hallway as they wrestled for the gun. Defendant fired the gun three more times, and Doneisha heard Denzel groan.

Defendant walked down the hallway and ordered them to leave the house. Doneisha put on her clothes and grabbed her cell phone and backpack. Defendant ordered them to get out of the house and said, " 'I'm gonna kill you.' " Defendant still had the gun in his hand as he watched them leave the house. He put the gun into his pocket and ordered Doneisha to give him the keys. She threw the keys to defendant and started walking down the driveway.

Defendant then reached for the gun. Doneisha turned around and begged him not to shoot. Defendant said he would kill them and that they thought he " 'was playin'.' " Defendant ordered Denzel to apologize, and Denzel said he was sorry. As they walked away, Doneisha called 911. The operator asked if Doneisha had just called and hung up. Doneisha explained, " 'Well this man is telling me he's gonna kill me if I call the police. Like I have to hang up. Like he can't see me on my phone.' " Almost halfway down the block, Doneisha saw defendant riding a bicycle toward them. He accused her of calling the police and " 'snitchin'.' " He said, " 'Yeah, we gonna see now. We gonna see who the snitch, bitch. You snitchin'? You callin' the fuckin' police? All right. We gonna see.' " Doneisha assured him that she did not call the police, and defendant rode back down the street.

Doneisha said that the firearm was silver and had a spinner for the bullets. She heard four gunshots total. After Denzel was shot, Doneisha stepped into the hallway while trying to help Denzel off the floor. Defendant pointed the gun at

both of them, told Denzel to get up or defendant would shoot Denzel again, and then told both of them to get out of the house. Doneisha was afraid that defendant would shoot them. Doneisha stated, "Um, [defendant] told me that if I didn't hurry—if I called the police he was gonna kill me. He said, 'If you call the police, bitch, I'm gonna—I'm gonna kill you, and I'm gonna shoot him again.' " Doneisha believed him.

Detective Vaughn asked Doneisha if she was certain defendant had not been in Volonda's house when they arrived. Doneisha said that she and Denzel had checked, and no one was home. She added that defendant told her, " 'You wanna come in my house. I'm gonna tell the police you was a fuckin' burglar. I didn't know who you was.' That's what he said to [her]." Detective Vaughn asked Doneisha about the knives. Doneisha said that Denzel put the knives in the guest bedroom after Volonda relayed that defendant threatened to shoot and kill Denzel during a phone conversation. Volonda told Doneisha defendant was very upset and Doneisha and Denzel should be careful. Doneisha said defendant did not have a key to the house. Detective Feola pointed out that the door was not damaged.

The detectives asked additional questions, reviewing information Doneisha previously provided. Doneisha said that she and Denzel looked out the guest bedroom door, then walked into the hallway and saw defendant in the hallway. Denzel ran into the hallway, ran back into the guest bedroom, and told Doneisha that defendant had a gun, but she had not seen it yet. Denzel attempted to keep the door closed as defendant tried to get into the room. Doneisha ended the call before Denzel opened the door and ran at defendant. She heard the first shot at that time but did not see if it hit anything or where the shot was directed; three more shots followed. Defendant walked from the primary bedroom, leaving Denzel on the floor bleeding.

Defendant pointed the gun at them and threatened to kill them if they did not leave the house. Doneisha and Denzel walked out the front door, past defendant, who still had the gun in his hand. Defendant then demanded Doneisha's keys and said he would tell the police that they were burglars and that he had not recognized them. At the end of the driveway, Doneisha shielded Denzel when defendant appeared to be reaching for his gun. She begged defendant not to shoot, and defendant demanded that Denzel apologize. Denzel apologized, and they managed to walk down the street past three houses before defendant caught up to them on a bicycle. Defendant accused Doneisha of calling the police and then said, "We'll see what's up."

In response to questioning, Doneisha explained that she had been staying at Volonda's house for the past three days. Doneisha turned her cell phone over to the detectives so they could download the information pertaining to the voicemail and calls from defendant.

### D. Volonda

Volonda testified that she had been dating defendant eight or nine months as of June 2016. They lived together at her house and shared the primary bedroom. Doneisha, her daughter, stayed with Volonda after Doneisha was released from custody in June 2016. Volonda and defendant picked Doneisha up when she was released from custody. Denzel was Doneisha's boyfriend and sometimes slept at Volonda's house.

Volonda began having medical issues in June 2016. After Volonda passed out at work, Doneisha took Volonda to the hospital. Defendant visited Volonda in the hospital, and she asked him to return her keys. Defendant left without returning them, and Denzel and Doneisha followed defendant out to retrieve the keys at Volonda's request.

Volonda suffered from memory loss because of her medical issues and did not remember leaving the hospital and several months thereafter. Volonda did not remember that detectives interviewed her regarding the shooting the day it happened while she was in the hospital. Upon hearing a recording of her interview with detectives after the shooting, Volonda recognized her voice but still did not recall the interview.

Statements from Volonda's interview were admitted into evidence as past recollection recorded under Evidence Code section 1237. When interviewed in June 2016, Volonda told the detectives that she had been dating defendant for one year as of June 9, 2016. She said she argued with defendant two days prior to the interview, when defendant refused to return her car key. Defendant took the keys when he left her hospital room, and Denzel followed at her request to retrieve them. Defendant called her later to say, " 'you know what—you just gave that boy a death wish.' " Defendant continued to "talk[ ] crap," so Volonda told him not to come to her house anymore and to "lose" her number.

During the interview, Volonda also described her key chain and keys and described defendant's key chain. She said that she only had one key to her vehicle and would take it off her chain to give to defendant when defendant borrowed the car. Volonda clarified that defendant had keys to her house because she had not kicked defendant out of the house until the evening before her interview while on the telephone. She told defendant not to come to her house or on her premises and that she hated having met defendant. Volonda said that Doneisha and Denzel had been staying at Volonda's house for a week with her permission.

During the second trial, defense counsel questioned Volonda concerning her testimony at the first trial. At the first trial, Volonda testified that she could not remember going to the hospital or anything that happened while there. However, at the second trial, Volonda testified that she remembered some things that happened while in the hospital, and she did not believe that her memory was based on what people may have told her. She remembered Doneisha taking her to the hospital and being in her hospital room while Doneisha, Denzel, and defendant were present.

### E. Dr. Victor Sorenson

Denzel was treated at Kern Medical Center by Dr. Victor Sorenson, who operated on him. Denzel had been shot in his right thigh, left hip, and the upper portion of his abdomen. Dr. Sorenson repaired two holes in Denzel's duodenum and removed his right kidney. Without surgery, Denzel would have bled to death.

### F. Detective Daniel McClive

Detective Daniel McClive, employed by the Bakersfield Police Department, examined Doneisha's cell phone and produced a report of its contents. The phone's log showed a six-minute voicemail left by defendant's phone and a text message to Doneisha's sister that confirmed Doneisha told her sister she was doing laundry at 11:09 p.m. on June 24, 2016.

### G. Jennifer Castro

Jennifer Castro was at her parent's house when Doneisha and Denzel knocked on the living room window seeking help. Denzel had a gunshot wound to his abdomen and was bleeding. Denzel was afraid, panicked, and in pain. While awaiting the ambulance, Denzel expressed the belief that he was bleeding to death. He then told Castro that Doneisha's mother's boyfriend had shot him.

### H. Officer Eric Hardin

Officer Eric Hardin, employed by the Bakersfield Police Department, responded to Castro's residence and contacted Denzel. Denzel was wearing a white T-shirt and blue boxer briefs and bleeding profusely from wounds to his leg and abdomen. Denzel was in pain and having trouble speaking and breathing. Denzel said that he had been shot by "his girlfriend's mom's boyfriend," who used a small black revolver.

### I. Juanita Lee

Juanita Lee worked as a laboratory technician for the Bakersfield Police Department. Lee responded to Volonda's house, where the shooting occurred, and both videotaped and photographed the interior and exterior. In the main hallway, Lee photographed a set of keys.[10] The keys were found near a blue bicycle that was also in the hallway. In addition, Lee recorded and photographed the cabinet at the end of the hallway. Lee located holes from a bullet in the right cabinet door, a sneaker stored behind the cabinet door, and the wall behind the cabinet. Lee could not retrieve the bullet because although it had entered the wall behind the cabinet, it did not exit the wall. The bullet hole in the wall was approximately six feet and two inches above the hallway floor. Lee discovered no blood on the knives found in the guest bedroom, but did discover blood in the primary bedroom, the primary bedroom exterior door, the entryway, and near the exterior of the front door.

### II. The defense case.

The defense rested without presenting any evidence.

Bailey, 2022 WL 352028, at *3–11 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

---

[10] Doneisha testified that these keys belonged to defendant and identified Volonda's car key on the key ring.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

1    If the Court determines there is governing clearly established Federal law, the Court must

2    then consider whether the state court's decision was "contrary to, or involved an unreasonable

3    application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.

4    § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

5    state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

6    of law or if the state court decides a case differently than [the] Court has on a set of materially

7    indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

8    word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

9    or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New

10   International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to

11   [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

12   governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

13   clearly established Supreme Court precedent, the state decision is reviewed under the pre-

14   AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

15   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

16   the state court identifies the correct governing legal principle from [the] Court's decisions but

17   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

18   "[A] federal court may not issue the writ simply because the court concludes in its independent

19   judgment that the relevant state court decision applied clearly established federal law erroneously

20   or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

21   538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists

22   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

23   Richter, 562 U.S. at 102. In other words, so long as fairminded jurists could disagree on the

24   correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If

25   the Court determines that the state court decision is objectively unreasonable, and the error is not

26   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

27   effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

28   ///

13

1    The Court looks to the last reasoned state court decision as the basis for the state court

2    judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859

3    (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the

4    reasoning from a previous state court decision, this Court may consider both decisions to

5    ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.

6    2007) (en banc). "When a federal claim has been presented to a state court and the state court has

7    denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

8    absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at

9    99. This presumption may be overcome by a showing "there is reason to think some other

10   explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v.

11   Nunnemaker, 501 U.S. 797, 803 (1991)).

12   Where the state courts reach a decision on the merits but there is no reasoned decision, a

13   federal habeas court independently reviews the record to determine whether habeas corpus relief

14   is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853

15   (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional

16   issue, but rather, the only method by which we can determine whether a silent state court

17   decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot

18   analyze just what the state court did when it issued a summary denial, the federal court must

19   review the state court record to determine whether there was any "reasonable basis for the state

20   court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or

21   theories . . . could have supported, the state court's decision; and then it must ask whether it is

22   possible fairminded jurists could disagree that those arguments or theories are inconsistent with

23   the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A.  Sufficiency of the Evidence

27   Petitioner asserts that there was insufficient evidence to convict him of count 7, which

28   charged Petitioner with dissuading a witness with force or threats of force with respect to

Denzel.[11] (ECF No. 1 at 4, 31.)[12] Respondent argues that the California Court of Appeal reasonably rejected Petitioner's insufficient evidence claim. (ECF No. 13 at 34.) This claim was raised on direct appeal to the California Court of Appeal, which denied the claim in a reasoned opinion. The claim was also raised in the California Supreme Court, which summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying the sufficiency the evidence claim, the California Court of Appeal stated:

**II. Defendant's conviction of dissuading a witness as charged in count 7 is supported by sufficient evidence.**

Defendant argues the evidence was insufficient to prove that he intimidated Denzel as charged in count 7. We reject defendant's argument that his actions were only directed to intimidating Doneisha and not Denzel and conclude that the evidence is sufficient to support defendant's conviction of dissuading Denzel from reporting the assault to the police.

**A. Standard of Review and Law**

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, disapproved on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 136.1 establishes two forms of the "dissuading" offense. Dissuading a witness from testifying is proscribed by subdivision (a). Relevant to this case, subdivision (b)(1) criminalizes trying to dissuade a victim from reporting a crime.

---

[11] For clarity and consistency with the state court opinion, the Court will refer to Denzel, Doneisha, and Volonda by their first names.

[12] Page numbers refer to the ECF page numbers stamped at the top of the page.

(§ 136.1, subds. (a), (b)(1).) "To prove a violation of section 136.1, subdivision (b)(1), the prosecution must show (1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making any report of his or her victimization to any peace officer or other designated officials." (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1320.) These offenses are felonies when the defendant's acts in contravention of section 136.1, subdivisions (a) or (b) are "accompanied by force or by an express or implied threat of force or violence, upon a witness or victim." (§ 136.1, subd. (c)(1).)

Criminal dissuasion may be inferred from the defendant's words or conduct; the defendant need not say, " ' "Don't testify," ' " or make an equivalent remark. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.) As explained in *People v. Foster* (2007) 155 Cal.App.4th 331, in view of this provision, section 136.1 "neither restricts the means a defendant selects to commit the offense, nor does it require that [the] defendant personally deliver the message to the witness." (*Foster*, at p. 335.) A threat need not actually deter or reach the witness because the offense is committed when the defendant makes the attempt to dissuade the witness. (*Ibid.*)

### B. Analysis

The prosecution asserted that defendant attempted to dissuade both Doneisha and Denzel from reporting defendant's crimes against them to the police. Defendant challenges the evidence that defendant dissuaded Denzel from reporting defendant's crimes to the police by threat or force. Based upon our review, we conclude there is ample evidence to support defendant's convictions under section 136.1.

"The crime of intimidating a witness requires proof that the defendant specifically intended to dissuade a [victim or] witness from testifying." (*People v. Young, supra*, 34 Cal.4th at p. 1210.) "It is the combination of defendant's actions and words ... that provides sufficient evidence that he intended to intimidate [Denzel] from [reporting defendant's crimes to the police]." (*Ibid.*) The trial evidence showed that Doneisha tried to contact the police on behalf of herself and Denzel at least two times before reaching the neighbor's residence and making the final call to 911.

According to Doneisha's testimony, the first attempt occurred after Denzel entered the hallway, returned to the guest bedroom, and attempted to hold the door closed to prevent defendant from entering. Denzel told Doneisha to call the police and defendant yelled, " 'Bitch, hang up the phone. You call the police, I'm gonna kill you and I'm gonna kill him too.' " Doneisha ended the call, scared that defendant would shoot them. Doneisha also provided this information to Detective Vaughn during her interview with the detectives. During her interview with Officer Moore at the scene, Doneisha also said that she attempted to contact the police, but defendant threatened to kill Denzel if she did, causing her to end the call. Denzel was with Doneisha during defendant's threats and would have heard them as well.

Doneisha testified that she ran into the primary bedroom where Denzel lay bleeding and called 911 again. She told the operator her name, address, and the nature of the emergency before defendant threatened her to hang up the phone. During her interview with Officer Moore, Doneisha said:

> "... I called 911 inside the house. [¶] ... [¶] ... When—when the shot went off. [¶] ... [¶] ... And he was like, 'if you get on that fucken phone, I'mma shot [*sic*] again.' So I had—already gave [the operator] the address and told her that he was shot. [¶] ... [¶] ... But I had to hang up. [¶] ... [¶] ... Because he was walking back towards the back and I didn't want him to shot [*sic*] again so I hung up."

Describing the call a second time, Doneisha said that after Denzel was shot, defendant ordered them from the house:

> "And I'm, like, '[defendant] we're going, like, please we're going.' And he was, like, 'If you call the fuckin' police' and I just hung up the phone like... [¶] ... [¶] ... Because he started walking back to see if I was on the phone. So I hung up the phone. I grabbed my back pack [*sic*] and I had slipped my pants on."

During her interview with the detectives, Doneisha described her second call to 911 after Denzel was shot. While Doneisha was trying to help Denzel leave the primary bedroom, defendant pointed the gun at both of them and told Denzel to get up or he would shoot Denzel again. Defendant told both of them to get out of the house. Doneisha stated:

> "Um, [defendant] told me that if I didn't hurry—if I called the police he was gonna kill me. He said, 'If you call the police, bitch, I'm gonna—I'm gonna kill you, and I'm gonna shoot him again.' "

When defendant threatened to kill Doneisha if she called the police after Denzel was shot, Doneisha was sitting with Denzel, and Denzel would have heard defendant's threat.

Thereafter, as Doneisha helped Denzel walk down the street, Doneisha called 911. She testified that she told the operator she had just called. While on the call, defendant approached her on a bicycle, and she ended the call. He said, " 'I knew you would call the police.' " She denied using the cell phone. Doneisha's interview with Officer Moore describes defendant as saying, " '[Y]eah we gonna see—we gonna see who gonna be the real snitch—let's see if these police show up—you wanna fucken call the police.' " In the same interview, Doneisha explained:

> "And I had already called [911] again. [¶] ... [¶] ... And so when he pulled up he was, like,—when I seen him on the bike I hurried up and hung up the phone again. [¶]... [¶] ... And so he pulled up and he said, 'We're gonna see if you gonna be a snitch.' " Defendant also said, " 'We gonna see if you called the fuckin' police' " and " 'I bet you fucking called the police bitch.' "

Doneisha denied calling the police and begged defendant to leave. She feared that defendant would shoot them.

During her later interview with the detectives, Doneisha explained ending the 911 call when defendant approached on a bicycle: "Well this man is telling me he's gonna kill me if I call the police. Like I have to hang up. Like he can't see me on my phone." When defendant reached them, he said, " 'Yeah, we gonna see now. We gonna see who the snitch, bitch. You snitchin'? You callin' the fuckin'

police? All right. We gonna see.' " Doneisha assured him that she did not call the
police and defendant rode back down the street toward Volonda's house.

The 911 recording also evidenced defendant's threats to prevent Doneisha from
contacting the police while walking from Volonda's house. Doneisha advised the
operator that she was at the neighbor's house. When asked if she called
previously, Doneisha responded, "I've been calling but I keep happen [*sic*] to
hang up because this guy's chasing us down the street and he told me if I called
the police ...." Doneisha testified that defendant said he would shoot them if they
called the police. Doneisha also said, "I tried to walk and get help because he
keeps following us. [¶] ... [¶] ... Well he's been riding around on his bike saying
that he was going to shoot if I called the police ...."

Defendant's words and actions exhibited an intent that his crimes go unreported to
the police. Both Doneisha and Denzel were victims and witnesses to the crimes,
and defendant's intent would have been defeated had either victim contacted the
police. Although defendant's words addressed Doneisha, Denzel was with
Doneisha and heard them as well. Defendant's words conveyed to each victim
defendant's intent to cause bodily injury if defendant's crimes were reported. A
jury could reasonably infer that Denzel understood defendant's words to threaten
injury to either Denzel or Doneisha even if Denzel were the one to contact the
police, and that defendant's words indicated that he would injure either Doneisha
or Denzel should either of them report his crimes to the police. We do not find it
reasonable to believe, based upon defendant's words and actions, that defendant
did not intend that his conduct similarly dissuade Denzel from reporting the
crime. Defendant offers no case law to support his argument that defendant must
personally address every victim or witness who is present for his words and
actions to dissuade them from reporting his crimes to the police.

Defendant argues that the prosecutor offered no evidence that Denzel was trying
to call the police or that defendant acted to prevent him from doing so. However,
defendant fails to provide any legal authority that the act of dissuading requires
the victim or witness to be in the act of making the report. In addition, a jury
could reasonably infer that defendant was trying to dissuade Denzel and Doneisha
from communicating with the police at times subsequent to the 911 calls. While it
is likely that defendant concluded Denzel was in no condition to use a phone to
call the police, a jury could reasonably infer that defendant's words and actions
were intended to dissuade Denzel from conveying the facts of the assault to the
police at any time in the future or cooperating in any subsequent investigation.
Even though Denzel was not then notifying the police of what had transpired, a
jury could reasonably infer that defendant's words and actions were intended to,
and capable of, affecting whether Denzel would provide information of
defendant's crimes if contacted by the police in the future. Thus, jurors could
have reasonably inferred that defendant intended to dissuade Denzel from
providing any information to the police concerning defendant's crimes.[13]

We conclude that the evidence was sufficient to support defendant's conviction of
witness intimidation as charged in count 7.

Bailey, 2022 WL 352028, at *21–24 (footnote in original).

---

[13] Defendant argues in his reply brief that the conduct underlying count 7 is "based on the moment when Doneisha
and [Denzel] were walking down the street," when defendant said, " 'I knew you would call the police.' "
Defendant's argument is unsupported by citation to case law or the record in this case, and we reject it.

18

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

"'After AEDPA, we apply the standards of Jackson with an additional layer of deference' to state court findings." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration omitted) (quoting Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). As the Supreme Court has stated,

> Jackson . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

Here, the California Court of Appeal cited to California state cases that held: (1) the prosecution must show the defendant has attempted to prevent or dissuade a person who is a victim or witness to a crime from making any report of his victimization to any peace officer or other designated officials; and (2) criminal dissuasion may be inferred from the defendant's words or conduct. These determinations are binding on this Court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

1    Petitioner argues that because his threats not to call the police were only directed at
2    Doneisha there was insufficient evidence that Petitioner maliciously tried to prevent or
3    discourage Denzel from making a report that he was a victim of a crime to law enforcement.
4    (ECF No. 1 at 31.) However, viewing the record in the light most favorable to the prosecution, a
5    rational trier of fact could have found true beyond a reasonable doubt that Petitioner dissuaded a
6    witness by force or threat with respect to Denzel. Both Doneisha and Denzel were victims and
7    witnesses to the offenses. While Petitioner may have directed his threats at Doneisha, Denzel
8    was with Doneisha and could hear Petitioner's threats, which clearly stated that Petitioner did not
9    want his criminal acts to be reported to law enforcement. A rational trier of fact could reasonably
10   infer that Petitioner's statements threatened injury to either Doneisha or Denzel even if Denzel,
11   rather than Doneisha, reported Petitioner's crimes to the police.

12       "When the deference to state court decisions required by § 2254(d) is applied to the state
13   court's already deferential review," Cavazos, 565 U.S. at 7, the Court finds that the state court's
14   decision denying Petitioner's sufficiency of evidence claim was not contrary to, or an
15   unreasonable application of, clearly established federal law. The decision was not "so lacking in
16   justification that there was an error well understood and comprehended in existing law beyond
17   any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is
18   not entitled to habeas relief on this claim, and it should be denied.

19       **B.  Cruel and Unusual Punishment**

20       Petitioner asserts that his 302 years to life sentence constitutes cruel and unusual
21   punishment. (ECF No. 1 at 4.) Specifically, Petitioner contends that because it would be
22   impossible to serve his sentence in a single lifetime before parole eligibility, his sentence is in
23   fact a de facto life without the possibility of parole sentence and "calling it anything else is cruel
24   and unusual because it creates a legal fiction which necessarily will result in a petitioner dying in
25   prison before he comes eligible to even seek parole" and "shocks the conscience." (ECF No. 1 at
26   37.) Respondent argues that habeas relief is not warranted because the Eighth Amendment claim
27   is procedurally barred and was reasonably rejected on the merits. (ECF No. 13 at 43–45.)

28   ///

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The claim was also raised in the California Supreme Court, which summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying Petitioner's Eighth Amendment claim, the California Court of Appeal stated:

> ### III. Defendant's prison term exceeding his life span does not constitute cruel and unusual punishment under the Eighth Amendment.
>
> Defendant contends that his 302 year-to-life sentence constitutes cruel and unusual punishment. He argues that his sentence, in reality, is a life sentence without the possibility of parole and "[c]alling a sentence something 'to life' " "shocks the conscience" by "creat[ing] a legal fiction" that "will result in a defendant dying in prison before he becomes eligible to even seek parole."
>
> Acknowledging that his cruel and unusual argument was not raised in the trial court, defendant argues that it is both a pure legal question and not subject to forfeiture as defendant's sentence is not lawful. The People respond that defendant's claim is forfeited and, if not, defendant's failure to engage in a proportionality analysis should be taken as a concession that his constitutional claim lacks merit. We conclude defendant has forfeited this issue by failing to raise it below and, even if it had been preserved, the constitutional claim is meritless.
>
> ### A. Defendant Has Forfeited This Claim
>
> "Whether a punishment is cruel and/or unusual is a question of law subject to our independent review ...." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.) As defendant concedes, however, he did not raise this issue in the trial court. California law is clear that by failing to raise the issue below, he has forfeited the claim. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247–1248, and cases therein cited.)
>
> Defendant argues that his claim is cognizable on appeal because it involves a "pure question of law." We are not persuaded. "Cruel and unusual punishment arguments, under the federal or California tests, require examination of the offense and the offender." (*People v. Norman* (2003) 109 Cal.App.4th 221, 229; accord, *People v. Speight, supra*, 227 Cal.App.4th at p. 1247.) The court begins by comparing the gravity of the offense and severity of the sentence and, if this supports an inference of gross proportionality, the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. (*In re Coley* (2012) 55 Cal.4th 524, 538, 540, 542.)
>
> Defendant argues that forfeiture does not apply to "a sentence ... which 'could not lawfully be imposed under any circumstances in the particular case,' " citing *People v. Nasalga*, (1996) 12 Cal.4th 784, 789. *Nasalga* has no application to

defendant's argument. Under *Nasalga*, "[a] sentence is unauthorized when it could not lawfully be imposed under any circumstance in the particular case: '[L]egal error resulting in an unauthorized sentence commonly occurs where the court violates mandatory provisions governing the length of confinement.' " (*Id.* at p. 789, fn. 4, first bracketed insertion added, quoting *People v. Scott* (1994) 9 Cal.4th 331, 354.) Defendant was not sentenced in excess of the term authorized by law. Therefore, *Nasalga* does not save his claim from forfeiture.

## B. Defendant's Sentence Is Not Unconstitutional

Even if we had not concluded defendant forfeited this claim, we would reject the claim on the merits. Rather than rely upon the proportionality analysis required by *In re Coley, supra,* 55 Cal.4th at page 538, defendant relies upon Associate Supreme Court Justice Stanley Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, noting that a sentence exceeding a human life span can serve no rational penological purpose and is inherently cruel and unusual. (See *id.* at pp. 600–601 (conc. opn. of Mosk, J.), citing *Furman v. Georgia* (1972) 408 U.S. 238, 331 (conc. opn. of Marshall, J.).) Justice Mosk's concurring opinion in *Deloza* was not the view of the majority of our Supreme Court and therefore has no controlling weight or precedential value. (*People v. Ceballos* (1974) 12 Cal.3d 470, 483; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 (*Byrd*).)

Defendant's argument, relying on *Deloza*'s concurrence, has also been rejected by other courts. (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1087–1092 [upholding sentence of 78 years to life even though no eligibility for parole until defendant would be 119 years old]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222, 1231 [upholding sentence of 135 years to life for 16 felony offenses arising from molestation of four children]; *Byrd, supra,* 89 Cal.App.4th at pp. 1375–1376, 1383 [upholding sentence of 115 years plus 444 years to life for 12 counts of robbery plus mayhem, and attempted premeditated murder, with personal discharge of firearm and three priors].)

Furthermore, defendant's sentence actually serves valid penological goals, including vindication of society's sense of justice, protecting society from criminal harms, and deterring criminal behavior. (See *People v. Mesce* (1997) 52 Cal.App.4th 618, 632 [the "classic concerns of sentencing" are "retribution, deterrence, and incapacitation"]; see also *In re Nuñez* (2009) 173 Cal.App.4th 709, 730 ["Valid penological goals include retribution, incapacitation, rehabilitation, and deterrence."]; *People v. Warner* (1978) 20 Cal.3d 678, 689 ["The paramount concern in sentencing must be the protection of society."].)

As explained in *Byrd*, "it is immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, even imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution. [Citation.] [¶] Moreover ..., a sentence such as the one imposed in this case serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future." (*Byrd, supra,* 89 Cal.App.4th at p. 1383.)

Although defendant does not argue disproportionality, we note that sentences exceeding human life expectancy, like defendant's, have been repeatedly upheld

against constitutional challenge as proportional. (See, e.g., *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1132, 1139–1141 [affirming sentence of 375 years to life plus 53 years for sexual assault on three women pursuant to "Three Strikes Law" after engaging in a proportionality analysis]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666–667 [affirming sentence of 283 years plus eight months for multiple sex offenses after engaging in a proportionality analysis]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 532 [affirming sentence of 129 years for sexual assault on children after engaging in a proportionality analysis].)

Defendant was convicted for attempting to murder Denzel and shooting him three times. He first entered the criminal justice system in 1977 as a juvenile. Between 1980 and 1995, defendant was convicted of nine felony offenses, including grand theft, burglary, resisting a police officer, transportation or sale of a controlled substance, oral copulation with a minor, assault with a deadly weapon, and kidnapping. For these crimes, defendant was sentenced to a total of 48 years in prison. Given this record, the sentence that defendant received in the instant case furthered acceptable penological goals of retribution, incapacitation, and deterrence and, accordingly, was not excessive. We therefore conclude that defendant's punishment was not cruel or unusual under either the state or federal Constitution.

Bailey, 2022 WL 352028, at *24–26.

1. Procedural Default

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989). In determining whether a state procedural ruling bars federal review, the Court looks to the "last reasoned opinion on the claim." Ylst, 501 U.S. at 804. See id. at 802 (defining an unexplained order as one "whose text or accompanying opinion does not disclose the reason for the judgment").

Here, the California Court of Appeal found that Petitioner conceded "he did not raise this issue in the trial court. California law is clear that by failing to raise the issue below, he has forfeited the claim." Bailey, 2022 WL 352028, at *24. This is known as the contemporaneous

1   objection rule. As the California Court of Appeal clearly and expressly stated that its decision on

2   the prosecutorial conflict of interest claims rest on a state procedural bar, procedural default is

3   appropriate if the state procedural bar is independent and adequate.

4        To qualify as "independent," a state procedural ground "must not be 'interwoven with the

5   federal law.'" <u>Park v. California</u>, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting <u>Michigan v.</u>

6   <u>Long</u>, 463 U.S. 1032, 1040–41 (1983)). "To qualify as an 'adequate' procedural ground, a state

7   rule must be 'firmly established and regularly followed.'" <u>Walker v. Martin</u>, 562 U.S. 307, 316

8   (2011) (quoting <u>Beard v. Kindler</u>, 558 U.S. 53, 60 (2009)). The Ninth Circuit has taken a burden-

9   shifting approach to determining the adequacy of a state procedural ground. <u>See</u> <u>Bennett v.</u>

10  <u>Mueller</u>, 322 F.3d 573, 586 (9th Cir. 2003). First, the respondent must plead an independent and

11  adequate state procedural bar as an affirmative defense. The burden then shifts to the petitioner

12  "to place that defense in issue," and can be satisfied by "asserting specific factual allegations that

13  demonstrate the inadequacy of the state procedure, including citation to authority demonstrating

14  inconsistent application of the rule." <u>Id.</u> If the petitioner satisfies his burden, the burden shifts

15  back to the respondent, which bears "the ultimate burden of proving the adequacy" of the state

16  procedural bar. <u>Id.</u> at 585–86.

17       The Ninth Circuit has previously recognized that California's contemporaneous objection

18  rule is an adequate and independent state procedural ground that constitutes a valid basis for

19  procedural default. <u>See</u> <u>Fairbank v. Ayers</u>, 650 F.3d 1243, 1256–57 (9th Cir. 2011) (applying bar

20  in context of prosecutorial misconduct); <u>Paulino v. Castro</u>, 371 F.3d 1083, 1093 (9th Cir. 2004)

21  (applying bar in context of jury instruction); <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1124 (9th Cir.

22  2002) (applying bar in context of admission of evidence); <u>Vansickel v. White</u>, 166 F.3d 953,

23  957–58 (9th Cir. 1999) (applying bar in context of peremptory challenge); <u>Rich v. Calderon</u>, 187

24  F.3d 1064, 1070 (9th Cir. 1999) (applying bar in context of prosecutorial misconduct). Petitioner

25  does not place the defense in issue by arguing that the contemporaneous objection rule is not

26  firmly established or inconsistently applied. Accordingly, the Court finds that the California

27  Court of Appeal applied an independent and adequate state procedural rule, and Petitioner has

28  procedurally defaulted this claim.

1    A petitioner "may obtain federal review of a defaulted claim by showing cause for the

2 default and prejudice from a violation of federal law." Martinez v. Ryan, 566 U.S. 1, 10 (2012)

3 (citing Coleman, 501 U.S. at 750). Here, Petitioner has not established cause for the default. In

4 any case, as set forth below, the Court finds that the state court's denial of relief on the merits

5 was not contrary to, or an unreasonable application of, clearly established federal law, nor was it

6 based on an unreasonable determination of fact. See Apelt v. Ryan, 878 F.3d 800, 825 (9th Cir.

7 2017) ("[W]hen a state court 'double-barrels' its decision—holding that a claim was

8 procedurally barred and denying the claim on its merits—both its procedural default ruling and

9 its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA.").

10    2.  Merits Analysis

11    "The Eighth Amendment, which forbids cruel and unusual punishments, contains a

12 'narrow proportionality principle' that 'applies to noncapital sentences.'" Ewing v. California,

13 538 U.S. 11, 20 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 996–97 (1991) (Kennedy,

14 J., concurring in part and concurring in judgment)). The Eighth Amendment "does not require

15 strict proportionality between crime and sentence but rather forbids only extreme sentences that

16 are grossly disproportionate to the crime." Graham v. Florida, 560 U.S. 48, 60 (2010) (internal

17 quotation marks and citations omitted). See also Lockyer v. Andrade, 538 U.S. 63, 77 (2003)

18 ("The gross disproportionality principle reserves a constitutional violation for only the

19 extraordinary case."). The Supreme Court has cautioned that "federal courts should be

20 'reluctan[t] to review legislatively mandated terms of imprisonment,' and that 'successful

21 challenges to the proportionality of particular sentences' should be 'exceedingly rare.'" Hutto v.

22 Davis, 454 U.S. 370, 374 (1982) (quoting Rummel v. Estelle, 445 U.S. 263, 274, 272 (1980)).

23    In Harmelin, the Supreme Court found that a sentence of life without the possibility of

24 parole for a first-time offender convicted of a nonviolent offense (possession of 672 grams of

25 cocaine) did not violate the Eighth Amendment. Harmelin, 501 U.S. at 961, 996. Here, Petitioner

26 was convicted of, *inter alia*, attempted murder with personal use of a firearm that resulted in

27 great bodily harm and the record reflects that "[b]etween 1980 and 1995, [Petitioner] was

28 convicted of nine felony offenses, including grand theft, burglary, resisting a police officer,

1  transportation or sale of a controlled substance, oral copulation with a minor, assault with a

2  deadly weapon, and kidnapping" and sentenced to a total imprisonment term of forty-eight years.

3  Bailey, 2022 WL 352028, at *26. Petitioner's sentence of 302 years to life does not constitute

4  cruel and unusual punishment given Petitioner's criminal history and the fact that he was

5  sentenced for multiple violent offenses. See Rummel, 445 U.S. at 274 ("[O]ne could argue

6  without fear of contradiction by any decision of this Court that for crimes concededly classified

7  and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state

8  penitentiary, the length of the sentence actually imposed is purely a matter of legislative

9  prerogative.").

10      In light of the Supreme Court's precedent and recognizing that "federal courts should be

11  'reluctan[t] to review legislatively mandated terms of imprisonment,' and that 'successful

12  challenges to the proportionality of particular sentences' should be 'exceedingly rare,'" Davis,

13  454 U.S. at 374 (citation omitted), the Court finds that the state court's decision denying

14  Petitioner's cruel and unusual punishment claim was not contrary to, or an unreasonable

15  application of, clearly established federal law. The decision was not "so lacking in justification

16  that there was an error well understood and comprehended in existing law beyond any possibility

17  for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to

18  habeas relief on this claim, and it should be denied.

19      **C. Volonda's Recorded Statement**

20      Petitioner asserts that Volonda's recorded statement to police was not admissible under

21  California Evidence Code section 1237 because "the prosecution failed to establish a proper

22  foundation for Volonda's statement because she had no recollection of making the statement or

23  having the conversation with Feola and Vaughan at the hospital in which the statement was

24  made." (ECF No. 1 at 29.) Respondent argues that Petitioner is not entitled to habeas relief

25  because he fails to state a federal constitutional claim. (ECF No. 13 at 33–34.)

26      In the California Court of Appeal, Petitioner asserted that "the trial court prejudicially

27  erred by admitting certain out-of-court statements from Volonda under the past recollection

28  recorded exception to the hearsay rule" and "failed to satisfy Evidence Code section 1237,

1  subdivision (a)(3)." <u>Bailey</u>, 2022 WL 352028, at *11. The California Court of Appeal denied the
2  claim in a reasoned opinion and relied exclusively on state law. <u>See id.</u> at *11–14. In the
3  California Supreme Court, Petitioner argued that "[b]ecause Volonda could not remember
4  speaking to Feola and Vaughan or telling them, in particular, that after [Denzel] retrieved her
5  keys from the appellant, appellant called her and said, 'You just gave that boy a death wish'
6  (3CT 760-761), that statement was not admissible under Evidence Code section 1237, and the
7  statement should not have been played for the jury or read into evidence." (LD 27 at 14.) The
8  California Supreme Court summarily denied Petitioner's petition for review. (LD 28.)

9       Petitioner did not raise a federal constitutional claim on direct review in the state courts
10  with respect to the admission of Volonda's recorded statement. And in the instant federal
11  petition, Petitioner does not refer even in passing to a federal constitutional right regarding
12  Volonda's recorded statement. Whether "evidence was 'incorrectly admitted . . . pursuant to
13  California law' . . . is no part of a federal court's habeas review of a state conviction." <u>Estelle v.</u>
14  <u>McGuire</u>, 502 U.S. 62, 67 (1991) (citation omitted). Petitioner's claim that Volonda's recorded
15  statement was incorrectly admitted pursuant to California Evidence Code section 1237 is not
16  cognizable in federal habeas corpus. <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010) (per curiam)
17  ("[I]t is only noncompliance with federal law that renders a State's criminal judgment
18  susceptible to collateral attack in the federal courts."); <u>Estelle</u>, 502 U.S. at 67–68 ("We have
19  stated many times that 'federal habeas corpus relief does not lie for errors of state law.' Today,
20  we reemphasize that it is not the province of a federal habeas court to reexamine state-court
21  determinations on state-law questions." (quoting <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990)));
22  <u>Maquiz v. Hedgpeth</u>, 907 F.3d 1212, 1217 (9th Cir. 2018) ("Federal habeas courts generally do
23  not review questions of state evidentiary law."); <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th
24  Cir. 2009) ("[A]dmission of evidence [is] an issue of state law. Simple errors of state law do not
25  warrant federal habeas relief."). Accordingly, Petitioner is not entitled to habeas relief on this
26  claim, and it should be denied.

27  ///

28  ///

## V.

## RECOMMENDATION

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __April 26, 2023__                                      _____

                                                        UNITED STATES MAGISTRATE JUDGE